# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DAVID VARGAS,                    )
                                 )
     Plaintiff,                )
                                 )    Case No. 17-cv-6481
  v.                             )
                                 )    Judge Robert M. Dow, Jr.
THOMAS E. PRICE,                 )
                                 )
    Defendant.                  )
                                 )

## MEMORANDUM OPINION AND ORDER

After not being promoted for two separate vacancies, David Vargas ("Plaintiff") filed this suit against his former employer, alleging discrimination and retaliation claims under Title VII and the Age Discrimination in Employment Act. [22, at 5–10]. Defendant[1] moved for summary judgment. [66]. For the reasons explained below, Defendant's motion for summary judgment [66] is granted in part and denied in part. Specifically, the Court grants Defendant's motion with respect to Plaintiff's retaliation claim regarding the first promotion process and all claims related to the second promotion process. The Court denies Defendant's motion with respect to Plaintiff's discrimination claims regarding the first promotion process and with respect to retaliation claims arising out of conduct occurring after Plaintiff's 2016 EEO complaint. The case is set for a telephonic status hearing on March 12, 2021, at 9:45 a.m. Call-in details will be provided in a separate minute order.

---

[1] Currently, Norris Cochran is serving as the acting Secretary of Health and Human Services. Pursuant to Fed. R. Civ. P. 25(d), he is automatically substituted for Thomas E. Price as Defendant in this action.

## I.   Background

These facts are taken from the parties' respective Local Rule 56.1 statements and supporting exhibits [67; 75; 80]. Courts are also entitled to consider any material in the record, even if it is not cited by either party. Fed. R. Civ. P. 56(c)(3). In evaluating a motion for summary judgment, the Court construes all facts in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of the nonmoving party. *Bell v. Taylor*, 827 F.3d 699, 704 (7th Cir. 2016). "When we cite as undisputed a statement of fact that a party has attempted to dispute, it reflects our determination that the evidence cited in the response does not show that the fact is in genuine dispute." *NAR Business Park, LLC v. Ozark Automotive Distributors, LLC*, 430 F. Supp. 3d 443, 446–47 (N.D. Ill.) (quotation marks and citation omitted).

Plaintiff is a Hispanic male born in 1970. [75, at 1 ¶ 2]. From 2010 to 2020, Plaintiff worked for the Food and Drug Administration's (FDA) Office of Criminal Investigations (OCI) as a Special Agent, GS-13 Criminal Investigator, in the Chicago Field Office. [*Id.*, at 1 ¶ 1; 75-5, at 89]. Special agents at the Chicago Field Office are divided into two squads, with one Assistant Special Agent in Charge (ASAIC) serving as the agents' first-line supervisor. [75, at 2¶ 3]. The ASAICs report to the Special Agent in Charge (SAIC), who acts as the agents' second-line supervisor. [*Id.*].

### A.   Plaintiff's 2014 EEO Activity

In December 2014, William Conway was Plaintiff's ASAIC. [*Id.*, at 2 ¶ 5]. In December 2014, Plaintiff filed an EEO charge against Conway, alleging that he had "been the target of constant scrutiny" and "harassment" by Conway and that he is "Hispanic and feel[s] that this also is a factor in the harassment." [67-7, at 23]. The EEO notified Conway of this charge on December

29, 2014. [*Id.*, at 28]. Plaintiff withdrew his complaint on February 3, 2015. [*Id.*, at 25]. Conway is now Plaintiff's SAIC. [75, at 2¶ 3].

## B.     First ASAIC Vacancy

In 2015, two of the three managers at the Chicago Field Office retired. [*Id.*, at 3 ¶ 7]. Mark McCormack, who is a SAIC at the Metro Washington Field Office [67-4, at 127, 5:5–6],[2] served as an acting SAIC in the Chicago Field Office from November 2015 to February 2016 [67-4, at 129, 10:22–11:6]. McCormack non-competitively placed Agent Ronne Malham, a white male, into an ASAIC position at the Chicago Field Office in an acting capacity for roughly two weeks in February 2016. [80, at 3–4 ¶ 4; 73-3, at 7, 18:6–17); 67-3 at 8]. The FDA's Merit Promotion Plan requires temporary promotions of more than 120-days to be filled through a competitive process. [75-4, at 3]. As such, OCI Headquarters sent an email to all agents to determine if anyone would be interested in a temporary detail to the ASAIC position. [67-3, at 8]. Plaintiff, Malham, and Jose Sanchez, who is Hispanic, applied for the position. [75, at 8 ¶ 3]. On February 18, 2016, an interview panel that included McCormack conducted an interview for the temporary position. [67-3, at 8; 75, at 3 ¶ 8]. The panel selected Malham for the 120-day acting ASAIC detail. [75, at 3 ¶ 8]. Prior to this interview, McCormack and Conway met with Malham to coach him "on how to respond to interview questions and how to prepare for the application process."[3] [75-3, at 132]. Malham served as acting ASAIC from March 2016 through June 2016. [67-4, at 154].

---

[2] When the Court cites to depositions, the first page of the citation (here, 127) cites to the page of the exhibit as docketed (here, 67-4). The subsequent citations refer to the page and line number of the depositions.

[3] McCormack and Mahlam denied that any coaching took place [67-4, at 130, 15:6–7; 67-3, at 3], and Defendant argues that Plaintiff's evidence in support of this fact is without foundation and inadmissible as hearsay [80, at 4]. Plaintiff relies on an affidavit from Adam Humeniak, a former special agent in the Chicago Field Office, stating:

> Prior to Ronne Malham being selected for the ASAIC position Conway and Mark McCormack met with him with him in Malham's office. The walls are thin and I could

OCI accepted applications for the permanent ASAIC position in May 2016. [67-5, at 2]. From these applications, a list of certified candidates was generated, which consisted of three internal candidates: Plaintiff, Malham, and Sanchez. [67-5, at 8–9]. Relevant here, Plaintiff's resume demonstrates that he had been a special agent at OCI since 2010, and his resume has two short paragraphs describing his work. [67-6, at 2]. He worked for the Drug Enforcement Agency (DEA) from 1996–2010, serving as a supervisory special agent from 2006–2010. [*Id.*, at 2–3]. Malham's resume listed that he had been an acting ASAIC at OCI since February 2016. [67-5, at 39]. Prior to that, he was an OCI special agent from 2007–2016, a Department of Homeland Security (DHS) special agent from 2001–2007, and an investigator at Cole Taylor Bank from 1999–2001. [*Id.*, at 40–42]. In 2006, he was a "Group Leader" for the "Counterfeit Squad" at DHS. [*Id.*, at 41].

On June 8, 2016, all three candidates were interviewed by George Karavetsos, the OCI Director, Catherine Hermsen, then SAIC of the Kansas City Field Office, Thomas South, SAIC of Headquarters Operations, and McCormack. [75, at 4 ¶ 10]. McCormack explained that he considered the candidates on "an even playing field" and "starting * * * from the same spot" before the interviews. [67-4, at 135, 34:8–20]. The FDA's Merit Promotion Plan gives "[m]anagement officials * * * the right to select or non-select from among a group of properly evaluated and

---

hear Malham being coached on how to respond to interview questions and how to prepare for the application process.

[75-3, at 132]. As to foundation, Humeniak explained that he directly overheard the coaching. See Fed. R. Civ. P. 56(c)(4) (explaining that affidavits must "made on personal knowledge"). As to hearsay, Humeniak's averment does not contain an of court statement, as it does not quote what anyone said. Even assuming that it does, "an out-of-court statement is not hearsay—and is generally admissible—if it is not offered to prove the truth of the matter asserted." *Lovelace v. McKenna*, 894 F.3d 845, 849 (7th Cir. 2018). Here, Plaintiff does offer Humeniak's averment to prove that whatever was said between McCormack, Conway, and Malham is true; instead, Plaintiff offers the averment to prove that McCormack and Conway coached Malham.

certificated candidates." [75-4, at 19]. It "encourage[s]" but does not require interviews. [*Id.*]. If an interview process is used, it must "be fair, equitable and justifiable." [*Id.*]. The interview lasted about 15 minutes and consisted of six questions. [67-3, at 6–7]. The interview panel did not use a scoring system or have a set of objective factors used to evaluate the candidate. [67-4, at 135, 35:2–5; 75-2, at 34, 127:22–128:4]. After the interviews, each panel member stated who they thought the best candidate was, and Plaintiff's name was never mentioned. [67-4, at 135, 34:22–35:1; 75-2, at 34, 128:5–12].

In November and December 2016, as part of an EEO investigation, South, Hermsen, and McCormack each completed an affidavit explaining why they selected Malham. [See 67-3, at 14–38]. In his, South emphasized that the interviews were "key because applicants must articulate how they will perform their supervisory responsibilities and motivate the agents who work for them to understand and implement agency priorities." [67-3, at 16]. He stated that the "ability to articulate OCI's investigative priorities [was] very important." [*Id.*]. And he explained that the "four interviewers were in unanimous agreement that Mr. Malham was the best candidate because he was able to articulate OCI investigative priorities and how he would implement those priorities." [*Id.*, at 17]. South explained that Plaintiff was not better qualified than Malham despite Plaintiff's DEA supervisory experience because Plaintiff "did not explain how his supervisory experience at DEA would cross over to his work at OCI." [*Id.*, at 18].

In her affidavit, Hermsen also emphasized the importance of the interview, stating that Malham was selected because his interview responses "were far superior" and that he "had the vision and ability to articulate how he would lead special agents in the field office." [*Id.*, at 26]. In contrast, she described Plaintiff's answers as "very vague" and explained that Plaintiff "talked about general ideas but was not able to articulate any specifics about the agency priorities or ways

to keep the agency relevant in pursuing these priorities." [*Id.*]. She also explained that "[b]eing a supervisor at one agency does not necessarily transfer to being a supervisor with another agency." [*Id.*].

McCormack's affidavit stated that he made his hiring "recommendations based on the resumes and interview responses." [*Id.*, at 34]. He explained that Malham "provided a strong interview performance and a clear articulation of an understanding of OCI investigative priorities" and how he, "as a first line supervisor[], if selected, would implement those priorities and would lead their subordinate employees." [*Id.*]. In contrast, he stated that Plaintiff's "presentations were not as articulate and he seemed to rely heavily on the fact that he had been a supervisor while working at the" DEA but did not "explain how that supervisory experience was relevant to OCI's mission and priorities." [*Id.*].

As part of this lawsuit, South, Hermsen, and McCormack also sat for depositions in 2019, three years after the interview. At that point, each had forgotten the specifics of the interview to varying degrees. For example, South did not remember the interviews, but explained that his 2016 affidavit was accurate. [75-2, at 37–38, 140:23–141:6, 144:3–12]. Hermsen could not remember specific questions or answers, but she recalled that Malham "was extremely well prepared for the interview" and was able to discuss the agencies priorities. [67-2, at 87, 89, 94, 44:19–45:7, 52:6–14, 70:11–18]. In contrast, she recalled that Plaintiff "wasn't able to answer the questions" and that his "was not a good interview." [*Id.*, at 93, 66:15–21]. During his deposition, McCormack could not recall any specific interview questions or answers or why Malham and Burdelik were more qualified than Plaintiff. [67-4, at 132–33, 22:12–21, 26:3–14]. McCormack emphasized that he "stands[s] by what [he] had written" in the affidavit. [*Id.*, at 139, 50:6–8]. He explained that although Plaintiff had previous supervisory experience with the DEA, he did not weigh that

experience heavily because Plaintiff "did not explain the relevance of that experience to OCI and OCI's mission." [*Id.*, at 139, 50:11–17].

C. **Second ASAIC Vacancy**

On June 26, 2016, Conway was promoted to a SAIC position at the Chicago Field Office, creating another ASAIC vacancy. [75, at 9 ¶ 18]. On July 13, 2016, the FDA announced this position, and seven OCI agents applied to it and were certified as eligible for the position by the FDA Office of Human Resources, including Plaintiff, Sanchez, Michael DeLeon, and Lynda Burdelik. [*Id.*, at 9–10 ¶ 19]. Plaintiff used the same resume for this application. [*Id.*, at 10 ¶ 20]. Relevant here, Burdelik's resume reflected that she began working as a special agent at OCI in 2008. [67-6, at 9]. Prior to that, she was a special agent in the United States Secret Service from 1997 to 2008. [*Id.*, at 11]. While there, she served as the group leader of the "Protective Intelligence Squad/Operations Squad." [*Id.*, at 12].

On August 12, 2016, all seven applicants were interviewed by Hermsen, who was by then Acting Deputy Director of OCI, McCormack, and Conway. [75, at 11 ¶ 23]. South recused himself from the interview panel because he knew that Plaintiff had filed an EEO complaint about the first promotion process. [*Id.*, at 17 ¶ 33]. He remained part of the process as the "selecting official," but he did not have any authority to reject the interview panel's recommendations. [75-2, at 11, 37:11–14]. Hermsen "may have been" aware of Plaintiff's EEO complaint prior to the August 2016 interviews. [67-2, at 97, 85:4–22]. The panel asked the same six questions as the previous ASAIC interview. [75, at 11 ¶ 23; 67-3, at 6]. After the interviews, the panel members stated who they thought should be promoted. [67-2, at 110, 137:18–22]. Hermsen thought DeLeon should be promoted, and McCormack and Conway thought Burdelik should be promoted. [*Id.*, at 111, 138:8–139:6]. Burdelik was initially Hermsen's "close number two." [*Id.*, at 111, 139:8–

10]. Hermsen, McCormack, and Conway talked through DeLeon's and Burdelik's answers to interview questions, experiences, and backgrounds, and they came to the consensus that Burdelik should be promoted. [*Id.*, at 111, 141:6–17].

Hermsen's and McCormack's affidavits also explained their reasoning for selecting Burdelik. [67-3, at 22–38]. Conway completed a similar affidavit in November 2016. [67-4, at 2–8]. Hermsen explained that the panel selected Burdelik because in her "responses she was able to articulate how she would fulfill her duties" and because Burdelik had a "clear idea of the agency priorities and was able to articulate her vision for keeping the agency relevant." [67-3, at 26]. She explained that in Plaintiff's second interview, "some of his answers were not responsive to the questions," "[h]e spoke in very general terms," and he "was not able to cite any specific examples for moving the office forward." [*Id.*]. In his affidavit, McCormack explained that Burdelik was selected because she "gave clear, articulate, meaningful and relevant responses to every question asked" and that she had "a strong interview performance and a clear articulation of an understanding of OCI investigative priorities." [*Id.*, at 34]. He indicated that Plaintiff's interview for this position was similar to his first interview, and that his "presentations were not as articulate and he seemed to rely heavily on the fact that he had been a supervisor while working at the" DEA but did not "explain how that supervisory experience was relevant to OCI's mission and priorities." [*Id.*, at 35].

In his affidavit, Conway explained that he was the direct supervisor of Plaintiff and Burdelik for the two years prior to the selection process and was therefore familiar with their work. [67-4, at 5]. His assessments of Burdelik and Plaintiff are based more on this familiarity than their interview responses. He explained that Burdelik exhibited leadership qualities and a "thorough knowledge of FDA laws and policies," that he has "complete faith in her ability to perform her

work without a lot of direction," that she has "good verbal and written communication skills," that "[s]he is respected by her peers and superiors," and that she "has shown the ability to work with others both within and outside the Agency." [*Id.*]. In contrast, Conway explained that Plaintiff did not exhibit as thorough knowledge of FDA laws and policies, that Plaintiff "needs direction to complete assigned tasks," that his "work typically has grammar and spelling errors and his reports need editing," that his "work is often submitted late," and that Plaintiff "does not have the respect of many of his co-workers." [*Id.*]. Conway noted that "[t]here are agents who will not work with [Plaintiff] unless directed by a supervisor to do so." [*Id.*]. Although he described his experience working with both Burdelik and Plaintiff, Conway also averred that Burdelik was selected because "[t]he interview panel was in unanimous agreement that she best met the qualifications [they] were looking for." [*Id.*, at 4].

As with the interviews for the first vacancy, the interview panelists could not recall the details from the second interview during their depositions three years later. Hermsen explained that her "general overall recollection" was that Burdelik had "a very good interview," "had a vision for supervising people," and that her "qualities as a * * * leader came out in the interview." [67-2, at 103, 106:1–15]. McCormack explained that he did not remember the interview but that he "stand[s] by what [he] had written in his affidavit." [67-4, at 139 50:5–18]. Conway did not remember the interview questions or specific answers. [80, at 12 ¶ 23]. He also explained that based on his experience supervising Plaintiff, Plaintiff was not qualified for a supervisor position. [67-4, at 38, 107:10–14]. At one point during his deposition, Conway agreed that he would not have recommended Plaintiff "no matter how well he did at th[e] interview." [*Id.*]. Later, however, he suggested that he may have recommended Plaintiff had Plaintiff "hit it out of the park" in the interview. [*Id.*, at 39, 112:6–10].

### D. Plaintiff's 2016 EEO Activities

On July 22, 2016, Plaintiff contacted an FDA EEO counselor alleging that he was not selected for the first vacancy because of his race, age, national origin, and "on the basis of retaliation." [67-8, at 3–4]. On September 7, 2016, he filed a formal complaint alleging that he was not selected for the first vacancy "based on age, race, [and] national origin" and that he wasn't selected for the second vacancy "based on age, race, national origin, and reprisal/retaliation." [*Id.*, at 11]. He also alleged that OCI "has a pattern of discriminating against minority applicants with regards to hiring and promotions for supervisory positions." [*Id.*]. On June 13, 2017, the EEO issued a final agency decision determining that Plaintiff was not discriminated or retaliated against. [*Id.*, at 19].

### E. Pattern or Practice of Discrimination and Retaliation

Plaintiff claims that OCI has a pattern or practice of discrimination and retaliation. In support, he first cites to a 2018 Department of Health and Human Services Midwest Area Office employee viewpoint survey. [75, at 27–28 ¶ 3]. In it, roughly 65% of eleven employees at the Chicago Field Office[4] indicated that they either disagreed or strongly disagreed with the statement "I can disclose a suspected violation of any law, rule or regulation without fear of reprisal." [75-2, at 90, 97]. Thirty-nine percent of respondents disagreed or strongly disagreed with the statement "Prohibited Personnel Practices * * * are not tolerated." [*Id.*, at 90, 101].

Next, Plaintiff recounts to two incidents involving Sanchez, who is Hispanic and filed an EEO complaint about the promotion processes. First, Plaintiff asserts that Sanchez was placed on restricted duty and forced to undergo a fitness-for-duty evaluation due to a health issue, whereas

---

[4] The survey identifies this subgroup as the "Midwest Area Office" of the "OFC of Criminal Investigations" of the FDA. [75-2, at 97]. The parties discuss this survey as providing data specific to the Chicago Field Office. [80, at 3].

Conway was unable to carry a firearm because of medical issues but was not placed on restricted duty. [80, at 16 ¶ 33]. Second, Plaintiff claims that Sanchez was suspended for 14-days for inadvertently sharing the name of an individual involved in a grand jury investigation with someone outside of OCI, but when a white employee did the same, OCI took no action. [*Id.*, at 17 ¶ 34].

Plaintiff also explains that another special agent, Adam Humeniak,[5] claims that he was retaliated against after contacting the EEO to make a reasonable accommodation request and after providing an affidavit for Plaintiff's EEO complaint. [75-3, at 133–34]. An investigative analyst at the Chicago Field Office stated that she once asked Conway if the reason she's "treated differently" was because she's "not Secret Service" or "because [she's] Black." [75-6, at 20]. Conway responded by "rais[ing] his voice and pointing his finger in [her] face." [*Id.*]. Two Hispanic special agents in the New York Field Office reported that they believed a white candidate for an ASAIC position was unfairly prepared for the selection process. [75-6, at 25, 30]. However, neither explained the basis for these believed; one of the agents also applied to the second ASAIC vacancy in Chicago and stated that he did not believe that his Hispanic national origin had a role in the panel's decision to not select him. [*Id.*, at 30].

---

[5] In his affidavit, Humeniak also states that "knowing [Plaintiff's] work experience," he "believe[s] the fact that [Plaintiff is] Hispanic was a factor" in Plaintiff not being promoted. [75-5, at 133]. He also states that he "heard Conway say he did not like [Plaintiff's] mannerism, his gestures or his 'fucking' face" and that he felt "Conway's comments were related to [Plaintiff] being Hispanic." [*Id.*, at 134]. However, nothing in Humeniak's statement explains how or why he thought that Plaintiff's non-promotions or Conway's actions were based on Plaintiff's national origin. And the Seventh Circuit has explained that "[c]onjecture, speculation, references to matters outside the [affiant's] personal knowledge, conclusory statements and bare assertions of the general truth of a particular matter will not suffice to withstand a properly supported motion for summary judgment." *Box v. A & P Tea Co.*, 772 F.2d 1372, 1378 (7th Cir. 1985) (alterations in original); see also *Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1146 (7th Cir. 1994) ("Inferences and opinions must be grounded on more than flights of fancy, speculations, hunches, intuitions, or rumors, and '[d]iscrimination law would be unmanageable if disgruntled employees * * * could defeat summary judgment by affidavits speculating about the defendant's motives.'" (alterations in original) (quoting *Visser v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991)). Accordingly, the Court does not consider these statements from Humeniak when ruling on Defendant's motion for summary judgment.

### F.      Post-Hiring-Process Events

On September 1, 2016, Conway sent an officewide email with the subject "Morale Issues." [67-7, at 4]. In it, he asks for his staff to inform him of the sources of office moral problems, either by email or anonymously, and he explains that he "need[s] to respond to an undercurrent of negativity that his harming the office." [*Id.*]. On September 22, 2016, Conway held an officewide meeting where he read a statement and provided all in attendance with two handouts, one entitled "12 of the Most Toxic Employees" and the other entitled "9 Toxic Employees You Should Fire Right Now." [75, at 21 ¶ 42]. His statement covered the recent promotions of Malham and Burdelik, dissatisfaction with Headquarters' case selection and priorities, the perceived favoritism in OCI toward former U.S. Secret Service Agents, and caseloads. [75, at 21–22 ¶ 43; 67-4, at 50, 155:10–11; 75-5, at 81–84]. With regard to the promotions, he stated that he could not discuss the promotion process, explained that "there are legal remedies if you feel you were wronged," and asked employees to stop complaining about the promotions. [75-5, at 81]. He closed the meeting by stating that "there are management options for dealing with those who are poisoning the workplace." [*Id.*, at 84]. In his deposition, Conway explained that the meeting was directed to the entire office. [67-4, at 52, 165:9–21]. Plaintiff felt that the meeting was directed at him and Sanchez, who is also Hispanic and filed and EEO complaint after not being selected for an ASAIC vacancy. [67-2, at 17, 60:12–15]. After the meeting, Plaintiff had a brief "heated" conversation with Conway in which Conway stated that "things need to change around here" and suggested that if they didn't, he might need to involve HR.[6] [67-2, at 19, 67:7–68:20].

---

[6] Defendant objects to this statement as hearsay. [80, at 11]. However, statements that are "offered against an opposing party" and that were "made by the party's agent or employee on a matter within the scope of that relationship and while it existed" are not hearsay. Fed. R. Evid. 801. Here, Conway's job involved supervising Plaintiff, and Conway made the statement in this capacity. Therefore, the statement is not hearsay. See *Aliotta v. Nat'l R.R. Passenger Corp.*, 315 F.3d 756, 762 (7th Cir. 2003) ("While the hiring/firing/promoting/demoting decisionmaking authority of the declarant may be critical in employment

Plaintiff alleges that after he filed his EEO complaint, he was subjected to retaliatory behavior, including the September 2016 meeting.  In addition to the meeting, Plaintiff alleges that office rules related to locators[7] were inconsistently applied to him and Sanchez, who is also Hispanic and filed an EEO complaint.  [80, at 15 ¶ 30].  Additionally, in December 2016, Plaintiff was scheduled to be on leave one afternoon.  [75-4, at 69].  In the morning, he conducted an interview, returned emails and phone calls offsite, and then began his leave time.  [*Id.*].  Afterwards, Conway threatened him with a disciplinary action, saying that Plaintiff should have come into the office before the interview and that Plaintiff needed to submit an additional 2.5 hours of leave.  Generally, special agents were not required to come into the office prior to a morning interview.  [67-2, at 21, 73:2–74:8].  Further, in his affidavit, Plaintiff stated that OCI prevented him from applying to another ASAIC vacancy and that he "was refused training, outside employment, and assigned a co-case assistant."  [75-5, at 88].  He also received lower performance evaluation scores related to communication; lower performance scores could lead to the loss of monetary performance awards and termination.  [80, at 15–16 ¶ 31].  Plaintiff retired "because it was obvious the discrimination and retaliation would never stop" and that he "would never advance in [his] career."  [75-5, at 89].

Plaintiff then filed this case, alleging discrimination on the basis of "race/national origin" with respect to the first and second promotion processes, discrimination on the basis of age with

---

cases in which the admission deals with hiring/firing/promoting/demoting-type decisions, no similar requirement exists in other contexts.  The only requirement is that the subject matter of the admission match the subject matter of the employee's job description.").

[7] A "locator" is a communication from special agents to their supervisor informing the supervisor when they will be offsite to, for example, conduct an interview or do surveillance and when they return or are done for the day.  [67-9, at 36, 118:3–10].

respect to the first promotion process, and retaliation with respect to both promotion processes and events after these processes. [22, at 5–10]. Defendant moved for summary judgment. [66].

## II.     Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "On a motion for summary judgment, the moving party has the burden of demonstrating that there are no genuine questions of material fact and that he is entitled to judgment as a matter of law." *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 (7th Cir. 1994). "Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials that 'set forth specific facts showing that there is a genuine issue for trial.'" *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008) (quoting Fed. R. Civ. P. 56(c)). As noted above, in evaluating a motion for summary judgment, the Court will construe all facts in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of the nonmoving party. *Bell*, 827 F.3d at 704.

## III.    Analysis

### A.      Promotion Related Claims

Plaintiff claims that when OCI failed to hire him for the first ASAIC vacancy, it discriminated against him based on his national origin and age and retaliated against him for past EEO activity. [22, at 5–10]. Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to

his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The Age Discrimination in Employment Act (ADEA) prohibits employers from taking the same actions because of someone's age. See 29 U.S.C. § 623(a)(1). "[T]he singular question that matters in a discrimination case [is] '[w]hether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'" *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018) (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)). "One method a plaintiff may utilize to present this evidence is the *McDonnell Douglas* framework," where the plaintiff must first demonstrate a *prima facie* case of discrimination. *Tyburski v. City of Chicago*, 964 F.3d 590, 598 (7th Cir. 2020). "In a failure-to-promote case, to establish a *prima facie* case a plaintiff must offer evidence that (1) he was a member of a protected class, (2) he was qualified for the position sought, (3) he was rejected, and (4) the employer promoted someone outside of the protected class who was 'not better qualified' for the position or who 'had similar or lesser qualifications.'" *Henderson v. Shulkin*, 720 F. App'x 776, 781 (7th Cir. 2017) (internal citations omitted) (first quoting *Riley v. Elkhart Cmty. Schs.*, 829 F.3d 886, 892 (7th Cir. 2016); second quoting *Whitfield v. Int'l Truck & Engine Corp.*, 755 F.3d 438, 444 (7th Cir. 2014)); see also *Jordan v. City of Gary, Ind.*, 396 F.3d 825, 833 (7th Cir. 2005) (applying this *prima facie* test in an age discrimination case).

If the plaintiff establishes a *prima facie* case, the employer "must then produce evidence of 'a legitimate nondiscriminatory reason for the employment action'; if the employer produces evidence of a legitimate reason, the plaintiff must then produce evidence that the employer's 'stated reason is a pretext.'" *Riley*, 829 F.3d at 891–92 (quoting *Simpson v. Beaver Dam Cmty.*

*Hosps., Inc.*, 780 F.3d 784, 790 (7th Cir. 2015)). "In order to demonstrate a material issue of fact as to pretext, a plaintiff must show that either (1) it is more likely that a discriminatory reason motivated the employer than the proffered non-discriminatory reason or (2) that an employer's explanation is not credible." *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004); see also *Mullin v. Temco Mach., Inc.*, 732 F.3d 772, 778 (7th Cir. 2013).

Title VII also "prohibits an employer from retaliating against an employee for opposing or participating in an investigation of an unlawful employment practice." *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018). At summary judgment, a plaintiff may "present evidence satisfying the elements of the retaliation claim: (1) he engaged in a protected activity, (2) he suffered an adverse action, and (3) a causal connection exists between the activity and the adverse action." *Id.* A plaintiff may use the *McDonnell Douglas* framework to show retaliation as well. *Id.* "That method allows the plaintiff to establish a prima facie case without proving a direct causal link by showing that (1) he engaged in a protected activity, (2) he performed his job duties according to his employer's legitimate expectations, (3) he suffered an adverse action, and (4) he was treated less favorably than similarly situated employees who did not engage in protected activity." *Id.* The remaining steps of the burden-shifting framework are the same for retaliation and discrimination clams. *Id.*

That said, "a plaintiff may put forth and a court may analyze evidence using the *McDonnell Dougla*s framework, but neither must do so." *Tyburski v. City of Chicago*, 964 F.3d 590, 598 (7th Cir. 2020). "The applicable standard at summary judgment is whether the evidence would permit a reasonable factfinder to conclude that" discrimination or retaliation "caused the adverse employment action—here, the failure to promote." *Henderson*, 720 F. App'x at 781; *Lewis*, 909 F.3d at 866–67 (explaining this standard in a retaliation case). Here, Plaintiff presents his evidence

both within the *McDonnell Douglas* framework and through a wholistic lens. To the extent necessary to resolve this motion, the Court does the same.

### 1. Exhaustion and Pattern-or-Practice Evidence

In Plaintiff's response and Local Rule 56.1 statement, he refers to other incidents of discrimination and retaliation within OCI. [See 75, 36–39 ¶¶ 30–38]. Defendant argues that Plaintiff failed to "exhaust his allegation that the agency had a 'pattern' of race/national origin discrimination." [68, at 7]. In doing so, Defendant argues that this "pattern" allegation is outside of the scope of the two claims accepted by the EEO Office, which relate narrowly to the two promotion processes. [*Id.*, at 7–8]. However, "[t]he scope of an administrative charge brought against [an] employer is determined by examining the claims that were 'brought to [the EEOC's] attention,' not by whether the EEOC actually considered or disposed of a given claim." *Reynolds v. Tangherlini*, 737 F.3d 1093, 1100 (7th Cir. 2013) (third alteration in original) (quoting *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1112 (7th Cir. 1992)). Here, Plaintiff's complaint to the EEO alleged that the OCI "has a pattern of discriminating against minority applicants with regards to hiring and promotions for supervisory positions." [67-8, at 11]. Thus, any pattern-or-practice claim was within the scope of Plaintiff's EEO charge.

Moreover, even if Plaintiff hadn't included this allegation in the charge, the Court may consider Plaintiff's pattern-or-practice facts. "A pattern-or-practice claim is typically raised in a class action to show that an employer had a wide-ranging policy to discriminate against class members." *Benjamin v. Katten Muchin & Zavis*, 10 F. App'x 346, 352 (7th Cir. 2001). Here, Plaintiff filed only individual claims. [See 22]. The Seventh Circuit has explained that plaintiffs may use pattern-or-practice evidence to demonstrate pretext to support their individual claims. See *Benjamin*, 10 F. App'x at 352 ("Individual plaintiffs do sometimes use pattern-or-practice

evidence to bolster their own disparate treatment claims as evidence of pretext."); *Bell v. E.P.A.*, 232 F.3d 546, 553 (7th Cir. 2000) ("[E]vidence of systemic disparate treatment is relevant to and probative of the issue of pretext."); *Henderson*, 720 F. App'x at 785 (explaining that district court wrongly dismissed "evidence regarding other employees and other matters not connected to" Title VII plaintiff because "a jury could infer discriminatory intent from that evidence"). Further, "a Title VII plaintiff need not allege in an EEOC charge each and every fact that combines to form the basis of each claim in her complaint." *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994). Accordingly, Plaintiff may use pattern-or-practice evidence to support his individual claims.

### 2. First Promotion Process

With respect to his age and national origin claims, Plaintiff is a member of a protected class,[8] Defendant concedes that Plaintiff was qualified for the promotion [68, at 9], and Plaintiff was not hired for the position. Defendant argues that Plaintiff cannot demonstrate the fourth element of the *prima facie* test: that Malham, the selected candidate, was not better qualified than Plaintiff. [*Id.*]. Specifically, Defendant notes that Hermsen, McCormack, and South all concluded that Malham had a superior interview and was able to clearly articulate the agency's priorities, whereas Plaintiff's interview was subpar. [*Id.*, at 10–11].

Recall that McCormack initially selected Malham on a non-competitive basis to temporarily fill the ASAIC position. [80, at 3–4 ¶ 4; 73-3, at 7, 18:6–17; 67-3 at 8]. Although Malham worked in this role for only two weeks before OCI conducted interviews for the acting

---

[8] Defendant argues that Plaintiff cannot establish a *prima facie* case of age discrimination because "the comparable employee must be at least ten years younger" and Malham is only seven years younger than Plaintiff. [68, at 12 (citing *Tubergen v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 517 F.3d 470, 475 (7th Cir. 2008))]. However, this ten-year gap is required only when both the plaintiff and the hired candidate are protected by the ADEA. See *Tubergen*, 517 F.3d at 475 n.4. Here, Malham was 39 at the time of his promotion and therefore was not protected by the ADEA. 29 U.S.C. § 631(a); [75-5, at 5, 6:15–16].

ASAIC position, the record supports an inference that McCormack and Conway coached Malham for that interview.  [67-4, at 154; 75-3, at 132].  Thus, it is reasonable to conclude that Malham was never actually competitively placed into the acting ASAIC position.  As explained above, the interview panel stressed that Malham's answers were superior because he could articulate the agency's priorities and explain how he would lead a team in obtaining those priorities.  A jury could infer that Malham's interview performance was improved based on the time he spent as acting ASAIC and/or the coaching he received for the February 2016 interview—including from one of the interviewers, McCormack.  In fact, it is not out of the question that prior to that interview Malham was fed the very answers that the interviewers found most compelling.  Given this, the Court is hesitant to consider, much less give dispositive weight to, the interview for the permanent position or any experience gained by Malham as acting ASAIC.  See *Fischer v. Avanade, Inc.*, 519 F.3d 393, 402 (7th Cir. 2008) (not considering experience that the selected employee gained when acting into a position in determining whether the plaintiff met the fourth prong of the *prima facie* test); *Crochrell v. Ill. Dep't of Transp.*, 2005 WL 2388267, at *5 (S.D. Ill. Sept. 28, 2005) (finding the plaintiff established a *prima facie* case when selected candidate "benefitted from significant pretraining provided by the outgoing" employee and that employee "authored the first draft of the questions ultimately used to evaluate the candidates").  And discounting this interview and experience, a reasonable jury could infer that Malham was not better qualified for the permanent ASAIC position, as the experiences listed on Malham's and Plaintiff's resumes are similar. Plaintiff had been a special agent since 2010, and before that was a criminal investigator at the DEA for ten years and a DEA supervisory special agent for four years.  [67-6, at 2–3].  Malham was an FDA special agent from 2007–2016, a DHS agent from 2001–2007, and an investigator at Cole Taylor Bank from 1999–2001.  [67-5, at 40–42].  In 2006, he was a "Group Leader" for the

"Counterfeit Squad" at DHS. [*Id.*, at 41]. Accordingly, drawing all factual inferences in favor of Plaintiff, the Court concludes he established a *prima facie* case.[9]

The burden now shifts to Defendant to articulate a legitimate, non-discriminatory reason for Plaintiff's non-promotion. Defendant attempts to satisfy this step by explaining that Malham was selected because in "June 2016," he "demonstrated the best management potential." [68, at 10]. However, as explained above, the June 2016 interview process for this ASAIC vacancy was suspect, as there is evidence that Malham was preselected for the role. "[P]reselection is relevant evidence of the employer's motivation." *Goostree v. State of Tenn.*, 796 F.2d 854, 861 (6th Cir. 1986). Moreover, allowing only the selected candidate to gain experience in an acting capacity "alone renders the panel selection process tainted." *Henderson*, 720 F. App'x at 785. This taint calls the OCI's reasons for its hiring decision into question. Therefore, Plaintiff has demonstrated a triable issue of fact on pretext.

Defendant also argues that Plaintiff cannot establish that the OCI's reasons for not promoting Plaintiff are pretext for age and national origin discrimination because not all the interviewers knew his age or his national origin. [79, at 4–5]. Plaintiff counters that the interviewers could infer his age based on the dates of his education on his resume and that they could infer that he was Hispanic based on his last name (Vargas) and the fact that his resume states that he is fluent in Spanish. [75, at 7]. From his resume, a reasonable jury could infer that the interviewers knew that Plaintiff was over forty and Hispanic. See *U.S. E.E.O.C. v. Target Corp.*, 460 F.3d 946, 961–62 (7th Cir. 2006) (finding that jury could infer that employer knew applicants' race based on their names and extracurricular activities listed on their resumes); *cf. Huri v. Office*

---

[9] The Court notes that Defendant offers no argument regarding the impact of McCormack's and Conway's coaching of Malham on either the *prima facie* or pretext analysis. Instead, Defendant only argues that the conclusion that coaching occurred lacks foundation and is based on inadmissible hearsay. As described above, *supra* note 3, this argument fails.

*of the Chief Judge of the Circuit Court of Cook Cnty.*, 804 F.3d 826, 834 (7th Cir. 2015) (inferring that the defendant could have known that the plaintiff was Muslim because she wore a hijab).[10] Accordingly, this argument fails.

However, Defendant is entitled to summary judgment on Plaintiff's claim that he was not hired for the first ASAIC position because of retaliation for his EEO complaint. At the time of the selection, Plaintiff's EEO activity consisted of the charge he filed against Conway in December 2014 and withdrew in February 2015. As Defendant notes, a year-and-four-month gap between EEO activity and a non-promotion is too long to realistically support an inference of retaliation. [68, at 14]; see also *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011) (concluding that two-month gap between protected activity and adverse employment action "not strongly suggestive of retaliation"); *Leonard v. E. Illinois Univ.*, 606 F.3d 428, 432 (7th Cir. 2010) (finding that six-month gap between protected activity and adverse employment action is "too long to infer a link between the two"). Plaintiff argues that his 2014 EEO complaint is not too remote because "Conway repeatedly expressed retaliatory motive both before and after the promotions at issue in this case." [77, at 14]. However, Conway was not involved in the selection process for the first ASAIC vacancy, so any retaliatory motive expressed by Conway is not relevant to that promotion process. This is true when considering the evidence under the burden-shifting framework or under the more holistic approach described in *Ortiz v. Werner Enterprises., Inc.*, 834 F.3d 760 (7th Cir. 2016). In sum, Defendant is entitled to summary judgment on Plaintiff's retaliation claim related to the first promotion process, but Defendant is not entitled to summary judgment on Plaintiff's national origin and age discrimination claims related to this process.

---

[10] The Court notes that in *Target*, the EEOC introduced expert testimony about inferring race from names. The Court offers no views at this time on whether such expert testimony would be necessary, or even helpful, in the context of this case.

### 3. Second Promotion Process

Plaintiff alleges that when he was not selected for the second ASAIC vacancy, OCI discriminated against him based on his national origin and retaliated against him for filing the 2014 EEO complaint and for filing an EEO complaint about the first promotion process. As with the first promotion process, Defendant argues that Plaintiff cannot establish a prima facie case because he cannot demonstrate that he was as qualified as Burdelik, the hired candidate. In arguing that Burdelik is better qualified, Defendant cites to her superior interview performance as described in the interviewers' December 2016 affidavits. [68, at 11–12]. Plaintiff contends that the interview panel's December 2016 affidavits contradict their 2019 depositions, creating a credibility question for the jury. [77, at 11–12].

The Seventh Circuit has explained that when a later affidavit contradicts an earlier deposition, "the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995). Plaintiff acknowledges that here, the affidavits were completed prior to the depositions, and that the "Seventh Circuit has ruled that 'the *Russell* analogy is imperfect' when the 'affidavit actually [was] executed prior to his contradictory deposition testimony.'" [77, at 11 (quoting *Harris v. Owens– Corning Fiberglas Corp.*, 102 F.3d 1429, 1432 (7th Cir. 1996))]. The *Harris* court explained that depositions have an increased level of reliability because they are adversarial and because most affidavits submitted in litigation are written by lawyers. 102 F.3d at 1432. The court did not need to resolve the issue in that case, and therefore it did not determine whether the district court was correct in discounting an affidavit that conflicted with a later deposition. *Id.*

22

Here, however, there are good reasons for not discounting panel members' affidavits. First, contrary to the concern in *Harris*, these affidavits were submitted by the panelists as part of an EEO investigation, not as part of litigation where a lawyer may have drafted the affidavits on their behalf. Further, *Harris*'s reliability concern perhaps cuts the other way here, where the deposition occurred three years after the interview. More to the point, the depositions do not contradict the affidavits. Instead, their depositions show that in 2019, the interview panelists no longer remembered the August 2016 interviews as well as they had in November and December of 2016. See *Noone v. Presence Hosps. PRV*, 149 F. Supp. 3d 904, 911 (N.D. Ill. 2015) (concluding that the plaintiff's "deposition testimony [did] not conflict with her affidavit" when she "testified that she could not remember" certain details and her affidavit included those details); *cf. Russell*, 51 F.3d at 68 (explaining that a "lapse of memory" is one acceptable reason for a contradiction between an affidavit and an earlier deposition). Moreover, the interview panelists reaffirmed their affidavits during their depositions. In her deposition, Hermsen explained that her "general overall recollection" was that Burdelik had "a very good interview," "had a vision for supervising people," and that her "qualities as a * * * leader came out." [67-2, at 103, 106:1–15]. McCormack explained that he did not remember the interview but that he "stand[s] by what [he] had written in his affidavit." [67-4, at 139, 50:5–18]. In his affidavit, Conway explained that he did not recommend Plaintiff because of his experience working with Plaintiff [67-4, at 5], a sentiment he echoed in his deposition [67-4, at 38, 107:10–12].

In short, a reasonable jury considering the affidavits and depositions could conclude that the interview panelists forgot the details of the interview over time. However, nothing in the depositions suggest that the interview panelists' affidavits were not truthful. Therefore, it is proper to rely on the affidavits at the summary judgment stage in determining whether Burdelik was a

superior candidate. That said, the Court need not determine whether Plaintiff establishes a *prima facie* case because even if he does, he fails to demonstrate that the OCI's stated reasons for not promoting him were pretext. As with the first promotion, Defendant again explains that OCI promoted Burdelik because the interview panel agreed that she should be promoted based on her superior knowledge of the agency's priorities and interview performance. [68, at 13]. The burden now shifts back to Plaintiff to demonstrate that these stated reasons are pretext. "Pretext is more than a mistake on the part of the employer; it is a phony excuse." *Hudson*, 375 F.3d at 561. "'The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered' for the adverse action." *Liu v. Cook Cnty.*, 817 F.3d 307, 316 (7th Cir. 2016) (quoting *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011)).

Plaintiff argues that OCI's reasoning is pretext because (1) the interview panelists' affidavits and depositions conflict, (2) Hermsen initially recommended DeLeon for the position, (3) Conway stated that Plaintiff never had a chance at the promotion, and (4) OCI has a history of discrimination and retaliation.[11] [77, at 4, 12–13]. With respect to Plaintiff's first argument, the affidavits and the depositions don't conflict, as explained above. The fact that the interview panelists did not remember the interviews as well in 2019 as they did in November and December

---

[11] Defendant argues that Plaintiff cannot demonstrate pretext based on the gap in credentials between Plaintiff and Burdelik. [68, at 12–13]. The court does not read Plaintiff as making this argument, and perhaps with good reason. For a gap in credentials to demonstrate pretext, "the gap must be so substantial [as to] 'slap you in the face.'" *Hudson*, 375 F.3d at 562 (quoting *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1179 (7th Cir. 2002)). Any difference between Plaintiff's and Burdelik's credentials does not rise to that level.

2016 does not create a genuine issue of fact on whether OCI's proffered reasons are a "phony excuse." [12] *Hudson*, 375 F.3d at 561.

Second, Plaintiff argues that OCI's reasoning is pretext because Hermsen initially stated she wanted to promote DeLeon and therefore the selection of Burdelik was not unanimous, as represented by Defendant. [77, at 12]. As explained above, panel members stated who they thought should be promoted after the interviews. [67-2, at 110, 137:18–22]. Hermsen initially stated that DeLeon should be promoted, and McCormack and Conway thought Burdelik should be promoted. [*Id.*, at 111, 138:8–139:6]. Burdelik was initially Hermsen's "close number two." [*Id.*, at 111, 139:8–10]. In her deposition, Hermsen explained that she, McCormack, and Conway talked through DeLeon's and Burdelik's answers to interview questions, experiences, and backgrounds, and they came to the consensus that Burdelik should be promoted. [*Id.*, at 141:6–17]. Thus, contrary to Plaintiff's argument, Hermsen was not "overruled" by "lower ranking" interviewers. [77, at 12]. Instead, as Hermsen explained, they "all came to a consensus after discussion that Lynda Burdelik was the selectee for the position." [67-2, at 111, 140:8–9].

In his third argument, Plaintiff asserts that OCI's reasons are pretext because "Conway admitted that Plaintiff never had a chance to be promoted, thus demonstrating that at the very least, the entire interview panel did not review 'the resumes, weigh[] the applicants' interviews, and their

---

[12] Plaintiff's reliance on *Henderson*, 720 F. App'x 776, does not suggest otherwise. [77, at 14]. There, the court questioned the "rigor of the selection process" when "the reviewers took no notes on their score sheets and, many times when questioned during their depositions could give only vague, unenlightening answers about why they scored individuals a certain way." *Id.* at 782. It concluded that "if even the reviewers cannot confidently explain why [the selected candidate] was advanced, it is not appropriate for us to conclude that there was a truly independent, merit-based, selection process that shows [he] was 'better qualified' as a matter of law." *Id.* Here, Hermsen and Conway took notes during the interview [67-2, at 89, 52:12–13; 67-4, at 76, 261:8–23], and all three interviewers executed affidavits roughly four months after the interview documenting why they selected Burdelik. Thus, this is not an instance in which the interview panelists could not explain why they chose the selected candidate. Moreover, in *Henderson*, there was evidence of preselection, 720 F. App'x at 782, which is not the case regarding the second ASAIC vacancy. And Plaintiff cites nothing to indicate that fading memory alone is sufficient to establish pretext.

knowledge of the agency's priorities as the basis for their selections.'" [77, at 12 (alteration in original) (quoting [68, at 13])]. In both his affidavit and interview, Conway maintained that, based on his experience as Plaintiff's direct supervisor, he did not believe Plaintiff could perform as an ASAIC. In his affidavit, Conway stated that Burdelik was selected because the "interview panel was in unanimous agreement that she best met the qualifications [they] were looking for." [67-4, at 4]. He also explained that Plaintiff did not exhibit as thorough knowledge of FDA laws and policies, that Plaintiff "needs direction to complete assigned tasks," that his "work typically has grammar and spelling errors and his reports need editing," that his "work is often submitted late," and that Plaintiff "does not have the respect of many of his co-workers." [*Id.*, at 5]. Conway noted that "[t]here are agents who will not work with [Plaintiff] unless directed by a supervisor to do so." [*Id.*]. Plaintiff cites to nothing indicating that Conway was required to disregard information he learned while working with Plaintiff when determining whether Plaintiff should be promoted to a supervisory role. Further, Plaintiff does not dispute the contents of Conway's affidavit by, for example, demonstrating that his written work did not contain errors or was not often submitted late.

Instead, Plaintiff highlights the difference between the explanation in Defendant's brief—"that the interview panel[] reviewed the resumes, weighed the applicants' interviews, and their knowledge of the agency's priorities as the basis for their selections" [68, at 13]—with the explanation provided by Conway—that he evaluated Plaintiff based on his knowledge of his work performance. This argument draws too fine a distinction to support pretext. Although Conway took his past knowledge of Plaintiff into account, he also explained that Burdelik was selected for the position because the interview panel unanimously selected her, consistent with Defendant's briefing. [67-4, at 4]. Further, Conway explained that he supported Burdelik because she had

better answers in the interview and could articulate the agency's priorities. [*Id.*, at 46, 140:1–5; 141, 9–10]. And between his affidavit and deposition, Conway consistently cites to his experience supervising Plaintiff as a reason he did not recommend him. [*Id.*, at 5, 38 107:10–12]. In short, Plaintiff's arguments are insufficient to demonstrate that OCI's proffered reason for not promoting him is a "phony excuse." *Hudson*, 375 F.3d at 561.

Fourth, Plaintiff relies on evidence of other discriminatory or retaliatory conduct by OCI. [77, at 5–6]. As explained above, pattern-or-practice evidence "is relevant to and probative of the issue of pretext." *Bell*, 232 F.3d at 553. That said, in an "individual rather than a class action" case, the Seventh Circuit has "held that evidence of a pattern or practice can only be collateral to evidence of specific discrimination against the plaintiff." *Matthews v. Waukesha Cnty.*, 759 F.3d 821, 829 (7th Cir. 2014). Here, there is no evidence of specific discrimination or retaliation against Plaintiff. And the *Matthews* court makes clear that in individual cases, pattern-or-practice evidence is not sufficient to establish retaliation or discrimination alone. 759 F.3d at 829; see also *Gilty v. Vill. of Oak Park*, 919 F.2d 1247, 1252 (7th Cir. 1990) (finding pattern-or-practice evidence insufficient to demonstrate individual discrimination).

Finally, the Court notes that in using the *McDonnell Douglas* framework, its analysis follows the parties' lead. Plaintiff also urges the Court to analyze the holistic framework described in *Ortiz*, 834 F.3d 760. [77, at 15]. *Ortiz* and progeny remind courts that in employment discrimination cases, courts should not separate out "direct" and "indirect" evidence and analyze each category separately. *Ortiz*, 834 F.3d at 765–66. "Instead, all evidence belongs in a single pile and must be evaluated as a whole." *Id.* at 766. Plaintiff argues that the evidence, "when analyzed in the aggregate, free from the strictures of the burden-shifting approach, would permit a reasonable jury to conclude that Plaintiff was discriminated against and retaliated against when

he was not promoted a second time." [77, at 15]. However, the evidence above does not suggest that OCI discriminated or retaliated against Plaintiff with respect to the second promotion process. And regardless of the analytical framework, "[t]he applicable standard at summary judgment is whether the evidence would permit a reasonable factfinder to conclude that" discrimination or retaliation "caused the adverse employment action—here, the failure to promote." *Henderson*, 720 F. App'x at 781. As the evidence would not permit a reasonable jury to find that discrimination or retaliation caused Plaintiff's non-promotion, the Court grants summary judgment to Defendant with respect to Plaintiff's claims related to the second promotion process.[13]

### B. Post-Promotion Retaliation

Defendant argues that he is entitled to summary judgment on any claim arising out of retaliation occurring after the promotion processes because Plaintiff failed to exhaust these claims. [68, at 8–9]. However, as Plaintiff explains, "a plaintiff who alleges retaliation for having filed a charge with the EEOC need not file a second EEOC charge to sue for that retaliation." [77, at 7] (quoting *Luevano v. Wal-Mart Stores, Inc.*, 722 F.3d 1014, 1030 (7th Cir. 2013)); see also *McKenzie v. Ill. Dep't of Transp.*, 92 F.3d 473, 477–78, 482–86 (7th Cir. 1996) (holding that Plaintiff did not need to file an EEO complaint for retaliation based on a previous EEO complaint even though the original EEO complaint was against one employee and the alleged retaliation included actions by other employees).

Defendant argues that *Luevano* does not apply here because (1) Plaintiff "cannot meet the requirements for amendment under Fed. R. Civ. Pro. 15" and (2) *Luevano* did not change the requirement that there be a reasonable relationship between the allegations in the EEO charge and

---

[13] As such, the Court need not address the parties' arguments regarding whether all members of the interview panel knew that Plaintiff filed an EEO complaint about the first promotion process. Even if the panelists knew of the complaint, no evidence suggests that they retaliated against Plaintiff by not promoting him.

those in the Title VII complaint. [79, at 13–14]. In *Luevano*, the plaintiff appealed from a motion

to dismiss. 722 F.3d at 1017. The court explained that the plaintiff "could add a claim for the

alleged further retaliation to an amended complaint so long as the amendment would be

permissible under Rule 15(a)." *Id.* at 1030. From this language, Defendant argues that *Luevano*

held that the plaintiff there did not need to "'file a second EEOC charge to sue for * * * retaliation'

because that plaintiff 'could add a claim for the alleged further retaliation to an amended complaint

so long as the amendment would be permissible under Rule 15(a)." [79, at 13–14] (quoting

*Luevano*, 722 F.3d at 1030). However, contrary to Defendant's argument, nothing in *Luevano*

links the rule regarding exhaustion of retaliation claims and Rule 15(a)'s requirements for amended

complaints. Instead, the opinion merely informs the *pro se* plaintiff that if she were to add

retaliation claims to her complaint, she must comply with Rule 15(a). Defendant also seems to

accuse Plaintiff of attempting to amend his complaint at the summary judgment stage. [*Id.*, at 14

("Certainly a response to a motion for summary judgment cannot meet the requirements for

amendment under Fed. R. Civ. Pro. 15; however, that is what Vargas is attempting.")]. Regardless

of the legal merits of this argument, it fails because Plaintiff's complaint did allege that Conway's,

Burdelik's, and Malham's actions after the promotion process constituted retaliation. [22, at 9

¶¶ 52–55].

Next, Defendant asserts that *Luevano* did not "remove[] the requirement for 'a reasonable

relationship between the allegations in the charge and the claims in the complaint.'" [79, at 14

(quoting *Cheek*, 31 F.3d at 500)]. Although true, this fact does not help Defendant. Seventh

Circuit cases adopting and applying the rule that "a separate administrative charge is not

prerequisite to a suit complaining about retaliation for filing the first charge" do so in part by

concluding that such retaliation complaints have a reasonable relationship to the initial EEO

charge. *Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1312 (7th Cir. 1989), superseded by statute on other grounds by as recognized in *Luevano*, 722 F.3d at 1030; see also *McKenzie*, 92 F.3d at 481–83 (stating that claim based on retaliation for filing EEO complaint must have a "reasonable relationship" to the initial EEO complaint and concluding that such relationship existed). Thus, the requirement for a relationship between the EEO charge and the retaliation claim in Plaintiff's federal complaint is met here.

Defendant made no other arguments[14] about Plaintiff's retaliation claim based on actions occurring after the promotion processes. As such, Defendant has not demonstrated that "he is entitled to judgment as a matter of law," *Green v. Whiteco Indus., Inc.*, 17 F.3d at 201, and the Court declines to grant him summary judgment on Plaintiff's retaliation claim arising out of any actions taken after Plaintiff filed his 2016 EEO complaint.

## IV.    Conclusion

For the reasons explained above, Defendant's motion for summary judgment [66] is granted in part and denied in part. Specifically, the Court grants Defendant's motion with respect to Plaintiff's retaliation claim regarding the first promotion process and all claims related to the second promotion process. The Court denies Defendant's motion with respect to Plaintiff's discrimination claims regarding the first promotion process and with respect to retaliation claims arising out of conduct occurring after Plaintiff filed his 2016 EEO complaint. The case is set for

---

[14] In his reply brief, Defendant notes that Title VII does not set forth "a general civility code" and that "supervisors are not prohibited from engaging in medieval, high-handed, or mistaken management practices." [79, at 15 (internal quotation marks and citations omitted)]. The Court does not read these two sentences as seriously raising the alternative argument that even if Plaintiff had exhausted his claims regarding post-promotion-process retaliation, then Defendant is nevertheless entitled to summary judgment. See *Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010) (explaining that "perfunctory and undeveloped arguments * * * are waived" (citation omitted)). Moreover, Defendant waived any such alternative argument by not raising it in his opening brief. See *Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 825 (7th Cir. 2015); *McCready v. Title Servs. of Ill., Inc.*, 2008 WL 2435933, at *3 (N.D. Ill. June 16, 2008) ("When a party fails to address an argument in his summary judgment brief, it is deemed a waiver.").

a status hearing on March 12, 2021, at 9:45 a.m. Call-in details will be provided in a separate minute order.

Dated: February 23, 2021

_____

Robert M. Dow, Jr.
United States District Judge